IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES,<br><br>    Plaintiff,<br><br>  v.<br><br>SHUNNEE KING,<br><br>    Defendant._____/ | No. C 06-00658 CRB<br><br>**ORDER RE: MOTION TO SUPPRESS** |

Defendant Shunnee King moves to suppress evidence discovered by the South San Francisco Police Department pursuant to a prostitution investigation. For the reasons set forth below, the Court GRANTS the suppression motion as to a camera and notebooks discovered in the hotel room and all evidence discovered in King's car. The motion is DENIED as to the government's entry into the hotel room, the search of the laptop, and the government's subsequent search of King's home.

**BACKGROUND**

This case arises from a sting operation of suspected prostitution activity in South San Francisco. In August of 2005, South San Francisco Police Sergeant Robert Eastman conducted an investigation into advertisements for prostitution posted on the Craigslist internet website. See Reporter's Transcript, People v. King, No. CC 622924 (Cal. Super. Ct. Feb. 27, 2008) at SK0384 [hereinafter "RT"]. Sgt. Eastman monitored postings offering

sexual services from a woman named "Stacy," who purported to be 19 years old. RT 384-85, 437.

On August 31, 2005, Sgt. Eastman scheduled a "date" with Stacy in order to investigate whether she was violating California's prostitution and licensing laws. RT 393. On the phone, "Stacy" instructed Sgt. Eastman to bring condoms to the Quality Inn in South San Francisco, and agreed to a price of $160 for a 30-minute "date." RT 396.

Before leaving for the Quality Inn, Sgt. Eastman enlisted the aid of five other detectives who would participate in the operation: Detectives Collins, Neary, Olsen, Campbell, and Gil. RT 400. Sgt. Eastman provided the detectives with a copy of the most recent advertisement and instructed them to identify her if Sgt. Eastman was unable to get the information himself. RT 401-02.

When Sgt. Eastman arrived at the Quality Inn, he went to the parking lot at the rear of the building, as directed. RT 402-03. Sgt. Eastman phoned "Stacy," who told him that she would meet him by the back stair to the hotel in ten minutes. RT 403-04. In the meantime, Detectives Collins and Neary went to the front desk and showed the desk clerk the advertisement. RT 551. The desk clerk told the pair that the girl in the advertisement's picture was staying in Room 318, and that the room was registered under the name Shunnee King. RT 552. Det. Collins conveyed this information to the other detectives, and all proceeded up to Room 318. RT 552. The officers proceeded directly to the room rather than waiting for "Stacy" to descend in order to promote officer safety by maintaining surveillance of the room in case anybody was with the suspected prostitute. RT 474.

Although the officers later provided inconsistent testimony about who took the staircase and who took the elevator, RT 464, 491, it is clear that all five detectives stationed themselves outside or near Room 318 to maintain surveillance, RT 465. The detectives saw a man exit Room 318 and, based on their training and experience, Detectives Olsen, Neary, and Campbell assumed that the man was either a pimp or customer. See RT 466; Neary Decl. ¶ 5; Campbell Decl. ¶ 6.

2

According to Det. Olsen's recollection, he and Det. Neary directed the man to the stairway and asked for his name. RT 467. The man identified himself as "Shunnee King," which Det. Olsen found significant because Room 318 was registered under the same name. RT 467. Det. Olsen knew from training and experience that pimps often carry weapons. RT 468. Det. Neary then conducted a pat-search of King, which revealed no incriminating evidence. RT 499.[1]

Det. Campbell then went to the door of Room 318 with one other detective and knocked on the door. See Campbell Decl. ¶ 8. One of the detectives announced that it was the police department. RT 475, 555. After a short pause, detectives knocked again. RT 468, 476. A female opened the door, whom Detectives Campbell, Collins, and Olsen identified as the girl in the advertisement. RT 475, 557; Campbell Decl. ¶ 8. Based on her appearance, Detective Campbell suspected she was a minor. See Campbell Decl. ¶ 8. Detective Neary believed the girl might be 14 or 15 years-old. Neary Decl. ¶ 6.

The girl, later identified as Tatiana "Doe," testified that after opening the door, the officers "ran in . . . [l]ike they were searching for something." RT 528. According to the officers, they conducted a protective sweep upon entering the room. RT 476, 557; Campbell Decl. ¶ 9. After it was determined that nobody else was in the room, Det. Olsen asked King to accompany him into the room, which King did. RT 476. King stood near the doorway, as did Det. Collins, who blocked the doorway to prevent entry or exit by anybody. RT 558.

Around that time, someone contacted Sgt. Eastman, who was still located in his car, and told him to come up to Room 318. RT 405. When he arrived in the room, Sgt. Eastman – in conjunction with Det. Neary – began to question Doe about her identity. RT 477. The suspect provided a name, stated that she was 19 years old, and that she had graduated from high school in Daly City. RT 478. Doe also revealed that King was her "boyfriend." RT 408.

---

[1] Det. Olsen's testimony conflicts with the memory of Det. Campbell, who believes he and Det. Olsen conducted the pat-down. See Campbell Decl. ¶ 7.

3

Doe carried no identification and the officers could not match her stated name to a form of California identification when the name was run through a database. RT 478. That fact, in addition to Doe's appearance, caused Sgt. Eastman to believe that Doe might be a minor. RT 409. Sgt. Eastman and Det. Neary discussed back and forth whether Doe looked under 18. Id. Det. Neary concluded that the girl was a minor, as did Det. Collins. RT 559; Neary Decl. ¶ 7. Det. Olsen also expressed concern that the girl was younger than 19. RT 478.

Sgt. Eastman used his cell phone to call the phone number listed in the "Stacy" advertisement, and a phone rang in the room. RT 411-12. Sgt. Eastman testified that he asked Doe if he could look at the phone, and that Doe consented.[2] RT 412; see also RT 479-80. He then confirmed that the number on the phone was his own phone number. RT 412. Sgt. Eastman then conducted a records check on Doe's telephone number and discovered that the phone was registered to a "Tatiana Doe." RT 413-14. Although that was in fact the suspect's real name, she maintained that Tatiana was her sister's name. RT 414. Doe also provided a list of addresses, but none were attributed to a Tatiana Doe. RT 415.

Sgt. Eastman then inquired into what Doe was doing in the room. RT 417. Doe admitted that she was and that she did not have a business license. RT 417, 418. While interviewing Doe, Sgt. Eastman viewed a laptop computer in plain view on a table. RT 419. Sgt. Eastman found the laptop significant because prostitutes who work out of hotels often use their laptops to post their ads on Craigslist. RT 419; see also RT 480. Sgt. Eastman asked whether Doe used the computer to post her ads, and Doe admitted that she did. RT 481. Det. Olsen then asked Doe whether the computer was hers, and she said yes. Id. Det. Olsen asked for permission to look into the computer for items of evidentiary value, and Doe allegedly said that would be fine. Id.[3] During his search, Det. Olsen found pictures consistent with those in the explicit internet ads. RT 481-82.

---

[2] Doe testified that Sgt. Eastman did not in fact request permission to look at her phone. RT 534.

[3] Doe testified that she could not recall the officers asking for permission to search the laptop. RT 535.

4

At some point, the officers searched other portions of the room. There were several bags along the wall and items of clothing in plain view. RT 419. One or two bags belonged to King, and the rest to Doe. RT 531. Doe does not recall whether officers asked for permission to look in the bags. Id. Sgt. Eastman recalls asking for and receiving permission to look through Doe's belongings. RT 421. Inside the bags, officers found documents related to prostitution activities and a digital camera. RT 421. The documents included handwritten notes with locations consistent with acts of prostitution. Id.

After failing to identify Doe, the officers "focused [their] attention on Mr. King for awhile." RT 427. At the time, King had not been arrested and was not handcuffed, but he was being detained. RT 428-29. An officer asked King and Doe how they arrived at the Quality Inn. RT 560. The pair responded that they had been dropped off by friends. Id. Det. Collins did not believe that response, and he asked King to stand up; Collins then conducted a pat-search of King's pants and felt a set of car keys in his pants pocket. Id. Det. Collins testified that he received consent to remove the keys from King's pocket, id., which King denies, King Decl. ¶ 6.

King denied that the keys belonged to him, but Det. Collins believed King was lying. RT 561. Det. Collins went to the parking lot and searched for the car belonging to King and Doe because he believed, based on training and experience, that people involved in prostitution keep evidence of prostitution and their identity in their vehicles. Id. There was a packaged condom on the ground next to the first vehicle that Det. Collins approached. RT 562. The car was registered to a rental car company, and Det. Collins opened the car with the keys from King's pocket. Id. Det. Collins immediately opened the glove box to locate the rental agreement, and discovered a gun. RT 562-63. Det. Collins then continued to search for identification and discovered a medical card with Doe's name and date of birth, which revealed that Doe was fourteen years old. RT 563. Det. Collins also located the rental agreement to the car, which showed that the car was rented to "Shenita King." Def. Exh. 4A.

Det. Collins then notified the other officers by radio of what he had found and advised them to place King under arrest immediately. RT 563-64; Police Report [Plfs. Exh. A] at 5.

5

United States District Court
For the Northern District of California

1  Officers handcuffed King and placed him under arrest for the loaded handgun.  RT 429;
2  Police Report at 5.  Doe was arrested for attempted prostitution and both subjects were
3  transported to the South San Francisco Police Department.  Police Report at 5.  The police
4  released Doe to her father, and booked and released King pursuant to California Penal Code
5  § 849(b)(1), which permits police to release a person who has been subjected to a warrantless
6  arrest when the officer is "satisfied that there are insufficient grounds for making a criminal
7  complaint against the person arrested."  Id.  Shortly thereafter, King returned to the police
8  station and requested the computer, claiming that it belonged to him.  RT 433.  Sgt. Eastman
9  refused to release the computer because it contained images of child pornography.  Id.

10  On November 10, 2005 – two-and-a-half months after the events in question –
11  Inspector Elaine Economous of the San Francisco Police Department brought Doe to the
12  attention of FBI Special Agent Adrienne Sparrow.  See Sparrow Decl. ¶ 3.  Inspector
13  Economous informed Agent Sparrow that Doe, now housed at the Hillcrest Youth Guidance
14  Center in San Mateo, had disclosed that she engaged in prostitution at the age of fourteen
15  with King as her pimp.  Id.  Agent Sparrow interviewed Doe on December 1, 2005, and Doe
16  revealed, among other things, that King likely had pictures of her in lingerie at his residence
17  in Pacifica.  See Sparrow Decl. ¶ 7.  Based on the information provided by Doe in her
18  interview, in conjunction with the evidence discovered at the August raid, the FBI secured a
19  search warrant for King's residence to look for evidence related to juvenile prostitution and
20  child pornography.  See Sparrow Decl. Exh. A.  The police searched King's residence and
21  discovered numerous pieces of evidence, including a rifle, sexually explicit photos,
22  ammunition, and a digital camera.  See id.

23  The government indicted King on September 28, 2006 for violations of 18 U.S.C. §
24  1591, sex trafficking of children, and 18 U.S.C. § 2425, transmitting information about a
25  minor.  King was also charged with violations in state court, and the state court held an
26  evidentiary hearing on February 27 and March 3, 2008, to consider King's suppression
27  motion.  At the conclusion of the March hearing, Judge Andrea Bryan summarily denied the
28

1  suppression motion.[4]  RT 622.  The court subsequently granted a motion to suppress all
2  evidence discovered in the December 14, 2005 search of King's home on the ground that
3  agents exceeded the scope of the warrant.

### LEGAL STANDARD

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Although "[i]t is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable . . . the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation and citation omitted).  Valid consent and exigent circumstances both justify warrantless searches.  A criminal defendant whose Fourth Amendment rights were violated by an unreasonable search or seizure can have evidence obtained from the illegal conduct excluded from the prosecution's case-in-chief at his trial.

### ANALYSIS

#### I. Standing

A person seeking to exclude evidence allegedly obtained in violation of the fourth amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence.  "[T]o say that a party lacks fourth amendment standing is to say that <u>his</u> reasonable expectation of privacy has not been infringed.  It is with this understanding that we use 'standing' as a shorthand term." United States v. Taketa, 923 F.2d 665, 669-70 (9th Cir.1991) (citation omitted) (emphasis in original).

To establish standing, the defendant bears the burden of proving that he has a reasonable expectation of privacy in the place searched or the item seized. See United States

---

[4] The state court's disposition is not binding because suppression rulings under California Penal Code § 1538.5, if not followed by a conviction, an acquittal, or a failure to appeal, are not final judgments under California law and therefore are without collateral estoppel effect. See Lombardi v. City of El Cajon, 117 F.3d 1117, 1121 (9th Cir. 1997).

7

1 v. Caymen, 404 F.3d 1196, 1199 (9th Cir. 2005). An individual has a reasonable expectation
2 of privacy if he can "demonstrate a subjective expectation that his activities would be private,
3 and he [can] show that his expectation was one that society is prepared to recognize as
4 reasonable." United States v. Nerber, 222 F.3d 597, 599 (9th Cir.2000). In determining
5 whether a defendant has standing, the Ninth Circuit has given weight to such factors as the
6 defendant's possessory interest in the property searched or seized, the measures taken by the
7 defendant to insure privacy, whether the materials are in a container labeled as being private,
8 and the presence or absence of a right to exclude others from access. See United States v.
9 Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007).

Because King had a reasonable expectation of privacy in the hotel room, the laptop, his own bags, and the car, King may challenge the search of each.

*1. Hotel Room*

The constitution's prohibition against unreasonable searches and seizures extends to protect the legitimate expectation of privacy of the occupant of a hotel. See Stoner v. California, 376 U.S. 483, 490 (1964). The fact that the room was registered in King's name and that King had not yet checked out is sufficient to establish that King had an expectation of privacy in the hotel room. See United States v. Cody, 434 F. Supp. 2d 157, 168 (S.D.N.Y. 2006).

*2. Laptop*

Individuals generally possess a reasonable expectation of privacy in their personal computers. See United States v. Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007). Doe testified that she purchased the laptop, RT 536, but a defendant who lacks an ownership interest may still have standing to challenge a search upon a showing of "joint control" or "common authority" over the property searched. United States v. Thomas, 447 F.3d 1191, 1198 (9th Cir. 2006). Doe conceded that she considered the computer to belong to both she and King, RT 536, and King has proffered evidence that he shared the computer with Doe, had her permission to use it, used it when he wanted to, and considered the computer as belonging to both he and Doe, see King Decl. ¶ 8. Because the government has not rebutted

8

that King used the computer as if it were his own, the Court finds that King exercised joint control over the laptop and that he therefore may challenge the government's search of the computer.

*3. Car*

A driver not listed on an automobile rental agreement may still challenge a search of the vehicle if he received permission to use the car from the renter and had joint authority over the car. See United States v. Thomas, 447 F.3d 1191, 1198-99 (9th Cir. 2006). King has submitted an affidavit providing that he had permission to drive the car from his mother, the authorized renter. See King Decl. ¶ 4. It is apparent that King, who was in control of the car keys, exercised joint authority over the vehicle. Accordingly, pursuant to Thomas, King has standing to challenge the search of the car.

II. Warrantless Entry into Hotel Room

King argues that the government violated his fourth amendment rights by entering the hotel room without a warrant. Because Doe voluntarily opened the door and the officers' entry was justified by exigent circumstances, the Court rejects King's argument.

*1. Opening of Door*

Relying on United States v. Winsor, 846 F.2d 1569, 1573 (9th Cir. 1988), King argues that the government effectuated an unlawful search when they gained visual entry into the hotel room. In Winsor, the police followed a bank robber into a hotel. Because the police did not know what room the suspect ran into, police knocked on every door with their guns drawn, and announced: "Police. Open the door." Id. at 1571. The suspect was arrested after he opened the door and was identified by officers. The police then entered the room where they found the defendant and evidence of the bank robbery. The defendant argued that police effected a nonconsensual search of the room when they knocked on the door and commanded that it be opened under claim of lawful authority. The Ninth Circuit agreed, rejecting the government's position that a search is not effectuated until a room is entered. The court also rejected the argument that the search could be sustained on the basis of consent because the suspect voluntarily answered the door. Id. at 1573 n.3. The court found

9

that in light of the undisputed facts – including that the police knocked on the door, identified themselves, and demanded that the occupants open the door, and that the suspect opened the door on command – there could be no consent as a matter of law. Id.

There is disputed evidence about the manner in which officers knocked on Doe's hotel room door. Doe testified that the police "bang[ed]" on her door "really hard," and identified themselves – by "yelling" – as the police. RT 524, 526, 528. Somewhat in contrast, police officers testified that they merely "knocked" on the door and "announced" themselves as police. See RT 475, 555. There was then a short period of time where the door was not opened – approximately 30 seconds to one minute – and police knocked again. See RT 476, 503. Doe opened the door after the second knock. RT 504.

Regardless of which version of facts is credited, Winsor is distinguishable because there is no allegation that the officers demanded entrance by, for example, commanding "Open the door." Winsor explicitly distinguishes the situation in which officers demand entrance, which constitutes a search, from the one where they merely knock and the door is answered voluntarily. See Winsor, 846 F.2d at 1573 (distinguishing Davis v. United States, 327 F.2d 301, 303 (9th Cir.1964), in which "the police did what any person could do-they knocked on the front door of a residence, but did not use their authority as police officers to command the occupants to open the door"). The Ninth Circuit has not yet extended Winsor beyond situations where police demand entrance, and this Court will not do so in the first instance.

*2. Entrance*

When Doe opened the door, officers "ran in . . . [l]ike they were searching for something." RT 528. The government argues that the officers' warrantless entry into the hotel room was lawful because they realized that Doe might be a minor, and entry was necessary to protect Doe from imminent injury.

The Fourth Amendment's warrant requirement is subject to an exception for exigent circumstances. "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City v. Stuart,

10

1  547 U.S. 398, 403 (2006) (internal quotation and citation omitted).  The Court must review
2  the government's contention that exigent circumstances justified their warrantless entry
3  under a two-pronged test, asking whether: (1) considering the totality of the circumstances,
4  law enforcement had an objectively reasonable basis for concluding that there was an
5  immediate need to protect others or themselves from serious harm; and (2) the search's scope
6  and manner were reasonable to meet the need.  See United States v. Snipe, 515 F.3d 947, 952
7  (9th Cir. 2008).

8        Under the totality of the circumstances, the government's entry was objectively
9  reasonable.  In United States v. Kenfield, 2008 WL 754205 (9th Cir. 2008), the Ninth Circuit
10 recognized that the exigent circumstances exception extends to situations where a minor is at
11 risk of sexual contact.  In Kenfield, a grandmother asked a sheriff's office to locate her
12 granddaughter.  The office received an anonymous tip that the girl was out getting drunk
13 with a man known to have engaged in sexual conduct with minors.  Id. at *1.  As the officer
14 approached the man's trailer, he smelled marijuana, and when he knocked on the door, he
15 heard music stop playing, saw lights go out, and heard running feet.  Id.  The Ninth Circuit
16 found that the officer reasonably believed that immediate entry was necessary to quickly
17 retrieve the juvenile.

18       Although Kenfield is unpublished and therefore not binding, the disposition's analysis
19 is persuasive to the Court.  The Court agrees that the exigent circumstances exception applies
20 where officers reasonably believe that a minor is at risk of being subjected to sexual contact.
21 The exception applies regardless of whether the minor's involvement is involuntary, see
22 United States v. Johnson, 22 F.3d 674, 680 (6th Cir. 1994), or voluntary, as in Kenfield.
23 Thus, while Doe may not have been at risk of immediate physical injury, the need to enter
24 the hotel room and secure Doe was justified by the likelihood that Doe would be subjected to
25 repeated sexual contact if left unprotected.

26       Moreover, entry into the room was reasonable to meet the need to protect Doe.  King
27 contends that other options – such as obtaining a warrant for custody – were available to the
28 police.  But at the time, the officers did not know whether a customer or pimp was still in the

11

room. Entry was necessary to immediately secure Doe's person and to protect the minor. The Fourth Amendment is designed to deter police misconduct, see United States v. Leon, 468 U.S. 897, 916 (1984), but it was not intended to be applied in an overly-formalistic manner to punish police who take immediate action to secure the person of a minor being used for sexual services.

### III. Warrantless Search of Hotel Room

King challenges the officers' subsequent search of the hotel room. Among other things, King objects to the search of the laptop and the bags that lined the wall of the room. The Court finds that the officers' search of the laptop was valid because they obtained consent. However, because the government has failed to establish where the digital camera and notebook were found – and because the police may have seized the items from a bag belonging to King – the Court grants the suppression motion as to the camera and notebook.

*1. Search of Laptop*

The government argues that the search of the laptop was justified because they obtained Doe's consent. It is well established that police may rely upon the consent of a third party if the party exercises actual or apparent authority over the property to be searched. See Illinois v. Rodriguez, 497 U.S. 177, 186 (1990). Here, Doe – as the owner of the laptop – exercised actual authority over the computer.

The question, therefore, is whether Doe actually consented to the search. Det. Olsen testified that Doe gave permission to look at the computer. RT 480. Doe testified that she did not recall giving the officers permission to look at her computer, but did not directly contradict Det. Olsen's testimony. RT 535. To overcome the government's evidence, King must present some evidence that creates a triable issue as to whether Doe gave consent to search the laptop. An equivocal statement that Doe cannot recall whether she gave consent is insufficient. Accordingly, the motion to suppress is denied as to the laptop.

*2. Search of Bags & Room*

The hotel room had several bags in it lined up against the wall. RT 419. Sgt. Eastman testified that he asked Doe's permission to look inside the bags, and he received her consent.

1  RT 421. Doe initially testified that she did not give her consent, but when pressed stated that
2  she could not recall being asked for consent. RT 531. Officers located a digital camera
3  inside the bags, which had been used to take sexually provocative pictures of Doe. RT 421.
4  In addition, Sgt. Eastman stated that he found documents – including a notebook –related to
5  prostitution activities near or in the bags. Id.; see also RT 446 ("[The notebook] was in the
6  area along the west wall. I can't tell you if it was on the table next to the laptop or one of the
7  bags next to the wall.").

8  Sgt. Eastman could not remember in which bags he had located the camera and
9  notebook. The record contains no evidence bearing on whether the camera and notebook
10 were located in Doe's bags, in King's bags, or somewhere else. This evidentiary deficiency
11 is critical because both parties agree that although Doe had authority to give consent over her
12 own bags, she could not consent to a search of the bags belonging to King.[5] If the camera
13 and notebook were located in King's bags, they must be excluded; if found in plain view or
14 in Doe's bags, the suppression motion must be denied. As a result, whether to exclude the
15 camera and notebook turns on the question of which party bears the burden of proving the
16 location of seized by the police.

17 Both parties acknowledge that there is no precedent directly bearing on the burden of
18 proof issue. The government argues that proving the location of the camera and notebook
19 should be part of the defendant's obligation to demonstrate that he has a reasonable
20 expectation of privacy in the items seized. See Gov. Supp. Br. at 2 (citing United States v.
21 Thomas, 447 F.3d 1191, 1199 (9th Cir. 2006)). According to the government, it is King's

---

[5] The Court agrees with the parties that Doe could not consent to a search of King's bags because she had neither actual nor apparent authority over them. As to actual authority, there is no evidence in the record that Doe exercised actual joint control over King's bags. As to apparent authority, the facts available to the police at the moment would not warrant a man of reasonable caution in the belief that Doe had authority over King's bags. See Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990). To be sure, Doe had mutual access to the room and King did not object when officers began their search. See United States v. Sealey, 830 F.2d 1028, 1031 (9th Cir. 1987). However, the room was registered in King's name, and a reasonable person would therefore conclude that at least some of the items in the room belonged to him. Moreover, no officer asked King whether any of the bags belonged to him. See id. Finally, the bags were the type of "'enclosed spaces'-such as suitcases . . . commonly used to preserve privacy." Id. Under the circumstances, the police should have asked King whether any of the bags belonged to him and whether he consented to a search.

13

burden to prove that he has standing to challenge the seizure of the camera and notebook, and part of that burden is proving that the items were located in his bag. Because there is no evidence in the record on the location of the camera and notebook, King has failed to carry his burden.

In response, King argues that where, as here, items are seized without a warrant, it is the government's burden to prove that an exception to the warrant requirement justifies the search. See Def. Supp. Br. at 2 (citing United States v. Rambo, 74 F.3d 948, 953 (9th Cir. 1996)). Since the "heavy burden" of proving that an exception to the warrant requirement exists "cannot be satisfied by speculation about what may or might have happened," United States v. Licata, 761 F.2d 537, 543 (9th Cir. 1985), the government has failed to prove that Doe's consent justified the search.

Ultimately, the question for the Court is whether it is more appropriate to put the burden on the government or the defendant. The Court concludes that it is more appropriate to put the burden of proving the location of items seized on the government for one simple reason. Defendants may sometimes (even often) know the location of a piece of evidence when seized, but at other times the defendant will not have access to the relevant information. For example, officers might seize an item when the defendant is not present, and the defendant will be unable to recall the location of the item with precision. But the government is always present when an item is seized, and therefore ought to be able to prove the location of the item in all cases through proper cataloguing techniques. Hence, if the government searches and seizes without a warrant, it is not unduly burdensome to expect the government to note the location of items seized so that a court can later determine whether the seizure was subject to a valid exception to the Fourth Amendment's warrant requirement.

Requiring the government to prove that the camera and notebook were in Doe's bags rather than King's is not unlike requiring the government to prove that seized items were in plain view. In both cases, it is the government – and the government only – that will have access to the relevant facts in all cases sufficient to prove the location of the seized item. See United States v. Love, 189 F.R.D. 557, 559 (noting that "the government is the party with the

14

access to the facts collected in investigation and pursuit of the defendant"). Therefore, the Court concludes that it is the government that bears the burden of proving the location of seized items.

Here, the government has failed to carry its burden. The only evidence in the record bearing on the location of the camera and notebook is Sgt. Eastman's equivocal testimony that the camera was in an unidentifiable bag and the notebook was either in a bag or on a table. Under the circumstances, it is just as likely that King – as Doe's pimp – kept the camera and notebook in his own bags as anywhere else.[6] Accordingly, the motion to suppress is granted as to the camera and notebook.

### IV. Search of King & Car

King moves to suppress evidence discovered in the rental car. The government's argument that the search was made incident to the arrest is meritless and no exigent circumstances justified search of the car. Accordingly, the Court will exclude evidence of the gun, of Doe's identification card, and any other evidence discovered in the car.

The government argues that Det. Collins' search of King and the car was justified by exigent circumstances because Collins was looking for identification of Doe. But a warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." Terry v. Ohio, 392 U.S. 1, 25-26 (1968). Doe was already located and in police custody at the time of the car search. The government fails to explain why officers could not keep Doe safe in the time it would take to obtain a warrant for the car. Presumably, the police could have either arrested Doe for prostitution or taken her into custody as a material witness while a warrant was being obtained. Either way, there is no reason to believe that the car had to be immediately searched in order to protect Doe from future sexual contact.

The government also contends that the search of the car was incident to King's arrest. This argument is unpersuasive for two reasons. First, the search incident to arrest exception only applies where the subject has been <u>arrested</u>. The officers unanimously testified that

---

[6] The Court need not and does not address the weight of the government's burden. Even if the burden is extremely light, the government has not borne it in this case.

15

King was not arrested until after the gun was found in the car.  See RT 414, 416, 428, 472-73.  To be sure, the officers were detaining King and King was not free to leave, but the exception does not apply where the subject has not been arrested.  See Menotti v. City of Seattle, 409 F.3d 1113, 1153 (9th Cir. 2005) ("We decline to extend the doctrine of 'search incident to arrest' to give protection for a warrantless search or seizure when no arrest is made.").

King was arrested after discovery of the gun, but the search incident to arrest doctrine generally applies only where the arrest precedes the search.  The Ninth Circuit has recognized an exception where the search is "roughly contemporaneous" with the arrest.  United States v. McLaughlin, 170 F.3d 889, 892 (9th Cir. 1999).  However, whether a search is contemporaneous "turns not upon the moment of arrest versus the moment of the search but upon whether the arrest and search are so separated in time or by intervening acts that the latter cannot be said to have been incident to the former."  Id. at 893 (quotation omitted).  Here, the arrest was predicated upon the search; discovery of the gun was the impetus for arrest.  It defies logic and reason to argue that police may engage in an otherwise unjustified search, discover evidence of wrongdoing, then arrest the suspect, and then justify the search on the search incident to arrest doctrine.  A search is not incident to an arrest if it is the predicate for arrest.

Second, the search incident to arrest doctrine is limited to situations where police arrest the "occupant" or "recent occupant" of an automobile.  New York v. Belton, 453 U.S. 454, 460 (1981).  That limitation provides a bright-line rule to police, authorizing a search when it is obvious that the subject was recently an occupant of the car, as, for example, when the officer sees the subject exit the vehicle.  See Thornton v. United States, 541 U.S. 615, 622 (2004).  But here, King was neither in a vehicle nor "next to a vehicle."  Id. at 621.  King was clearly not near the car and the government has proffered no evidence suggesting that he was a recent occupant at the time of the search.  Accordingly, the search incident to arrest doctrine is inapposite.

///

1  V. Effect of Suppression: Fruit of the Poisonous Tree

2  King believes that because the search of the hotel was unlawful, the Court should also
3  exclude evidence discovered at his house in the subsequent search. The government
4  contends that even if the hotel search was flawed, the search of King's house was based on
5  independent evidence obtained from an interview with Doe, and therefore no evidence
6  discovered at King's residence should be excluded. Because there was sufficient
7  independent evidence to support issuance of the warrant, the Court denies the suppression
8  motion as to evidence discovered at King's house.

9  "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result
10 of an illegal search or seizure, but also evidence later discovered and found to be derivative
11 of an illegality or 'fruit of the poisonous tree.'" Segura v. United States, 468 U.S. 796, 804
12 (1984) (citations omitted). "It 'extends as well to the indirect as the direct products' of
13 unconstitutional conduct." Id. (quoting Wong Sun v. United States, 371 U.S. 471, 484
14 (1963)).

15 There are three exceptions to the fruits of the poisonous tree doctrine. The
16 independent source exception is at issue in this case. It allows admission of evidence that is
17 actually found by legal means through sources not tainted by the illegal search. See United
18 States v. $493,850.00 in U.S. Currency, 518 F.3d 1159, 1165 (9th Cir. 2008). When the
19 defendant asserts that a warrant is predicated on illegally-obtained evidence, the reviewing
20 court must excise the tainted evidence and determine whether the remaining, untainted
21 evidence would provide a neutral magistrate with probable cause to issue a warrant. United
22 States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987).

23 The affidavit submitted in support of a search warrant for King's house included both
24 tainted and untainted evidence. After excluding the tainted evidence – including evidence
25 relating to the digital camera, see Affidavit at 10 – there would still be sufficient evidence to
26 provide a neutral magistrate with probable cause. This evidence includes King's statement
27 that the laptop containing images of Doe belonged to him, and Doe's interview with agents
28

wherein Doe acknowledged that King was her pimp and would likely have evidence in his house.  Hence, the exclusionary rule does not reach evidence obtained at King's residence.

## CONCLUSION

The motion to suppress is GRANTED as to the camera, notebook, and all evidence seized from the rental car.  The motion is DENIED as to the laptop and all evidence seized at King's residence.

**IT IS SO ORDERED.**

Dated: May 28, 2008

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE